UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | | |
|---|---|---|
| BLEID SPORTS, LLC | ) | *Electronically Filed* |
| | ) | |
| PLAINTIFF, | ) | |
| v. | ) | |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | ) ) | |
| | ) | CASE NO. _____ |
| DEFENDANT. | ) | |
| | ) | |
| Serve:  National Collegiate Athletic Association  700 West Washington Street  Indianapolis, Indiana 46204 | ) ) ) ) ) ) ) ) ) | |

**COMPLAINT**

Plaintiff Bleid Sports, LLC, for its Complaint against Defendant, the National Collegiate Athletic Association, states as follows:

**INTRODUCTION**

This is an action by Bleid Sports, LLC ("**Bleid Sports**" or "**Bleid**") a Lexington, Kentucky-based organizer and promoter of middle and high school basketball tournaments, for damages incurred as the result of the unlawful, unreasonable, and unfair rule enforcement practices of Defendant, the National Collegiate Athletic Association ("**NCAA**").  Because Bleid Sports had scheduled its tournaments for well-known college venues (such as Rupp Arena or the KFC Yum! Center), it sought – and received – confirmation from the NCAA that its tournaments would not violate NCAA recruiting rules.

However, in November 2011, less than 48 hours before Bleid was to hold its first tournament at Rupp Arena in Lexington, Kentucky, the NCAA abruptly reversed its position. It informed the University of Kentucky's compliance officer, Sandy Bell, that Bleid's event was *not* permitted under NCAA recruiting rules and could potentially subject the University, which plays at Rupp Arena, to sanctions. As a result, Rupp refused to host the event, and Bleid was forced to quickly move its scheduled tournament to a local high school, leading to a loss of ticket sales and sponsorships. Moreover, as word of the NCAA's new interpretation spread, Bleid was forced to cancel the remainder of its events at college venues throughout the country, resulting in substantial damages that eventually resulted in Bleid going out of business.

Bleid reasonably relied on the NCAA's past assurances to Bleid regarding its compliance with NCAA rules. Moreover, the NCAA had previously approved similar events held by Rob Blair, the CEO of Bleid Sports, in 2009 and 2010 at Rupp Arena, and has continued to allow a similar event in Michigan to occur. The NCAA's arbitrary and inexplicable decision, which resulted in Bleid's events being barred from college arenas, has caused significant harm to Bleid, and Bleid is entitled to compensation for the damages it has suffered.

## THE PARTIES

1. Plaintiff Bleid Sports, LLC is a Kentucky Limited Liability Company that, until the events that form the basis for this lawsuit occurred, was in the business of organizing and promoting tournaments for middle and high school basketball teams at high-profile venues throughout the United States.

2. The National Collegiate Athletic Association is an unincorporated voluntary association in which more than 1,000 colleges and universities are members. The NCAA is headquartered in Indianapolis, Indiana, and is found in, and transacts business in, Kentucky. Fourteen of its member colleges and universities are located in Kentucky.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Count V of this Complaint, which asserts a violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. *See* 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the remaining counts of this Complaint because these claims are so related to Bleid Sports' federal law claim that they form part of the same case or controversy. *See* 28 U.S.C. 1367(a).

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

**A.   Bleid Sports Organizes And Promotes High School Basketball Tournaments.**

5. Bleid Sports was in the business of organizing, coordinating, and promoting middle and high school basketball tournaments. These events gave student athletes the opportunity to compete against each other at well-known venues throughout the United States.

6. All of the teams participating in Bleid Sports' events were affiliated with public or private middle or high schools. Amateur Athletic Union ("**AAU**") or "club" teams were not permitted to participate.

7. Many of the teams that were invited to play in Bleid Sports' tournaments were well-known regionally and/or nationally and featured players who had the potential to go on to play NCAA Division I basketball.

8. In addition to providing opportunities for athletic competition, Bleid's tournaments allowed participating schools to raise money through ticket sales. Each school that participated in the tournament would purchase a number of tickets, which the schools were then able to sell to raise funds.

9. Bleid Sports would sell additional tickets to the event to generate revenue. Bleid also generated revenue through corporate sponsorships and the sale of advertising space at each venue.

10. One of the main attractions for schools, fans, and corporate sponsors was the fact that Bleid Sports' events were to take place at major college arenas, such as Rupp Arena in Lexington and the KFC Yum! Center in Louisville.

11. As of November 2011, Bleid Sports had scheduled 18 such tournaments for the 2011-2012 high school basketball season. The tournaments were to be held at venues that included Rupp, the Yum! Center, the Peoria Civic Center, the University of Virginia, and the University of Oregon. Approximately 18 to 20 school basketball teams could participate in each event.

12. As of November 2011, Bleid had either signed or agreed to contracts with between 10 and 15 facilities to hold tournaments there. Bleid had also contacted and registered numerous school teams from around the United States to participate in its tournaments, and had already accepted thousands of dollars in registration fees, sponsorship fees, and ticket sales. Bleid was also in the process of negotiating season-long sponsorships with national sponsors.

13. Additionally, Bleid Sports was already in discussions with additional arenas and school teams for tournaments to be held during the 2012-2013 high school basketball season.

14. All of Bleid Sports' events for the 2011-2012 season had received approval from the National Federation of State High School Associations and the respective state high school athletic associations in the states where each tournament was to be held.

**B.    The NCAA's Rule Regarding Non-Scholastic Events At College Arenas.**

15. The NCAA promulgates rules that govern numerous aspects of member institutions' athletic programs. It also enforces those rules and imposes penalties on institutions

4

that do not comply with them. Part of the NCAA's business is also to provide advisory opinions and guidance as to compliance with its rules.

16. Although membership in the NCAA is voluntary, member colleges and universities must comply with all applicable NCAA rules. Failure to follow NCAA rules can subject member institutions to sanctions, which can include public reprimands, scholarship penalties, or, in very serious cases, bans on post-season competition or televised games.

17. NCAA Bylaw 13.11.1.8 states as follows:

> An institution . . . shall not host, sponsor or conduct a nonscholastic basketball practice or competition in which men's basketball prospective student-athletes . . . participate on its campus or at an off-campus facility regularly used by the institution for practice and/or competition by any of the institution's sport programs.

18. The NCAA's purported rationale for this Bylaw is to keep member institutions from gaining unfair recruiting advantages by hosting practices or tournaments where prospective recruits compete.

19. Because of its inclusion of the word "nonscholastic," the target of the rule appears to be AAU teams, which are essentially "all-star" teams of student athletes drawn from various schools and are not affiliated with any one educational institution.

20. Under the Bylaw, only contracts for non-scholastic practices or tournaments signed before October 29, 2009 may be honored. Thus, the "effective date" of the Bylaw is October 29, 2009.

    **C.    Bleid Sports – And Rupp Arena – Seek And Receive Event Approval From The NCAA.**

21. In May 2011, Bleid Sports contacted Ken Huber, the NCAA's Assistant Director of Enforcement, to confirm that holding its events at arenas where college teams play would not

violate NCAA rules. Huber told Bleid to contact the Administration of Membership Affairs ("**AMA**") department.

22.     When Bleid contacted the AMA, it received the case number 185-588. The NCAA informed Bleid that its events were considered "scholastic" because they had received approval from local high school athletic associations and from the National Federation of State High School Associations.

23.     On November 21, 2011, a legal representative of Rupp Arena also contacted the NCAA seeking confirmation that the "Rumble At Rupp" events, which were Bleid Sports tournaments scheduled to be held at Rupp on multiple dates, including November 25, 2011, complied with NCAA rules.

24.     The legal representative was given the case number 457-215, and was told that the tournament was in compliance with NCAA rules.

25.     Based on the NCAA's representations to both it and to Rupp Arena, Bleid Sports reasonably believed that its events did not violate Bylaw 13.11.1.8 because the Bylaw bars only "nonscholastic" events at college venues.

26.     In its discussions with the NCAA, Bleid Sports had explained the event in detail. The NCAA had explicitly told Bleid, that its events were considered "scholastic." Specifically, Steve Chan, who works for the AMA Department, informed Bleid that its events would not violate NCAA rules.

27.     Moreover, the NCAA had allowed three high school basketball tournaments identical in format to those organized by Bleid Sports to occur at Rupp Arena in 2009 and 2010, further indicating that such tournaments were "scholastic" under NCAA rules.

28. The NCAA has also allowed a similar tournament, which is held at Michigan State University, to occur since 1999. This is despite this tournament's open admission that its "agenda [is] to expose the top players in Michigan to the basketball facilities and environment of Michigan State University, and hopefully, sway some of them into considering MSU as a basketball destination."

      **D.    The NCAA Reverses Course – Less Than 48 Before Bleid's Rupp Arena Event.**

29. Bleid Sports' first event of the 2011-2012 season was the "Rumble At Rupp," which was scheduled to be held at Rupp Arena on Friday, November 25, 2011.

30. Twenty-two high school teams and four middle school teams had registered to participate in the November 25 tournament. Bleid had signed a contract with Rupp to hold the tournament at the facility. Bleid had also signed a corporate sponsorship contract with the Lexington Herald-Leader newspaper.

31. On Wednesday, November 23, 2011, the University of Kentucky filed a Legislative Relief Waiver request with the NCAA in a further effort to ensure that the tournament at Rupp would not subject the University to NCAA sanctions.

32. Despite its two prior representations that Bleid Sports events did not violate NCAA rules, the NCAA denied the University's waiver request late in the afternoon on November 23.

33. As a result of the NCAA's denial, Rupp Arena refused to host the event.

34. Bleid Sports was forced to quickly relocate the Rumble At Rupp to Lexington Christian Academy, a local high school.

35. Because the event could no longer be held at Rupp Arena, Bleid Sports was forced to refund each participating school's registration fee. It also lost ticket sales and sponsorships.

### E. The NCAA's Actions Lead Other Venues To Cancel Their Contracts With Bleid Sports.

36. As word of the NCAA's decision regarding the Rupp Arena event spread, the other venues with which Bleid had contracted to host events began cancelling their contracts.

37. Eventually, Bleid was forced to cancel all of its scheduled events for the 2011-2012 season and refund registration fees, ticket purchases, and sponsorship fees.

38. A crucial element of Bleid Sports' business consisted of the ability to host tournaments at well-known college venues. The loss of that ability meant the Bleid was no longer able to engage in the business of hosting and promoting middle and high school basketball tournaments.

39. As a result of the NCAA's actions, Bleid Sports has suffered substantial damages, including lost revenue from registration, ticket sales, and sponsorship fees. Bleid has also lost goodwill and the benefit of the contracts it was in the process of negotiating for the 2012-2013 basketball season.

40. Furthermore, the NCAA's actions have limited competition in the middle and high school basketball tournament market by effectively shutting Bleid out of the market while allowing other, similar events to continue.

### COUNT I
### (FRAUD)

41. Bleid Sports repeats and realleges each and every preceding paragraph of this Complaint.

42.     The NCAA made a material representation to both Bleid Sports and Rupp Arena that Bleid's events were "scholastic" under NCAA guidelines. This representation was false, and was either known to be false when made or was made with reckless disregard for its truth.

43.     In making this statement, NCAA induced Bleid Sports to continue with its plans for its tournaments.

44.     Bleid Sports reasonably relied on the NCAA's representations in entering into contracts with venues, soliciting participation from teams and sponsors, selling tickets, and negotiating agreements with venues for future events. Bleid Sports would not have taken these actions if not for the NCAA's representations.

45.     As a result of the NCAA's fraudulent representations, Bleid Sports has suffered substantial financial injuries that entitle it to damages.

## COUNT II
## (NEGLIGENT MISREPRESENTATION)

46.     Bleid Sports repeats and realleges each and every preceding paragraph of this Complaint.

47.     The NCAA, in the course of its business, supplied false information to Bleid Sports regarding the NCAA's interpretation of its rules.

48.     Bleid Sports had sought this information from the NCAA for guidance in Bleid's business transactions.

49.     The NCAA failed to exercise reasonable care in communicating this information to Bleid.

50.     Bleid Sports reasonably relied on the NCAA's negligent representations regarding its rules in entering into contracts with venues, soliciting participation from teams and sponsors,

selling tickets, and negotiating agreements with venues for future events. Bleid Sports would not have taken these actions if not for the NCAA's representations.

51. As a result of the NCAA's negligent misrepresentations, Bleid Sports has suffered substantial financial injuries that entitle it to damages.

## COUNT III
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS)

52. Bleid Sports repeats and realleges each and every preceding paragraph of this Complaint.

53. Bleid Sports had contracts with numerous venues throughout the United States, including Rupp Arena, under which the arenas agreed to allow Bleid Sports to host its tournaments at their facilities. The NCAA had knowledge of one or more of these contracts.

54. By abruptly and arbitrarily changing its interpretation of Bylaw 13.11.1.8, the NCAA intentionally, knowingly, and wrongfully induced the arenas to breach those contracts with Bleid Sports.

55. The NCAA took these actions without justification or privilege.

56. As a result of the NCAA's intentional interference with Bleid Sports' existing contractual relationships, Bleid Sports has suffered substantial financial injuries that entitle it to damages.

## COUNT IV
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS)

57. Bleid Sports repeats and realleges each and every preceding paragraph of this Complaint.

58. Bleid Sports had existing and continuing business relationships with numerous entities, including school basketball teams, arenas, and sponsors. The NCAA had knowledge of those relationships.

59. The NCAA has interfered with Bleid Sports' actual and/or prospective business relationships, and/or with its actual and prospective customers by engaging in improper and intentional acts, including arbitrarily declaring that Bleid Sports' events do not comply with NCAA rules despite its prior representations to the contrary, as well as its refusal to enforce its own rules against Bleid Sports' competitors.

60. The NCAA took these actions without justification or privilege.

61. As a result of the NCAA's intentional interference with Bleid Sports' existing and prospective business relationships, Bleid Sports has suffered substantial financial injuries that entitle it to damages.

## COUNT V
## (ANTITRUST)

62. Bleid Sports repeats and realleges each and every preceding paragraph of this Complaint.

63. The NCAA has participated in an agreement with and among its members.

64. That agreement, as described more fully above, unreasonably restrains trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

65. The NCAA's unlawful and arbitrary actions have unreasonably restrained trade in the relevant market, which is the market for the organization and promotion of scholastic basketball tournaments.

66. The NCAA's unreasonable and arbitrary interpretation of Bylaw 13.11.1.8 with respect to Bleid Sports has limited competition in this market by preventing Bleid Sports from

holding its events at major collegiate venues while allowing at least one other entity to continue to do so.

67. As a result of the NCAA's actions, consumers of such tournaments – which consist of scholastic basketball players and fans – have fewer options for tournaments in which to participate or to watch, and are therefore damaged by the limits the NCAA has imposed on competition.

68. Moreover, Bleid has suffered significant damages because it has effectively been precluded from competing in the relevant market.

### COUNT VI
### (PUNITIVE DAMAGES)

69. Bleid Sports repeats and realleges each and every preceding paragraph of this Complaint.

70. By taking the actions described above, the NCAA has acted toward Bleid Sports with oppression, fraud, and/or malice.

71. Punitive damages are necessary to punish the NCAA for its prior conduct and to deter any such future conduct.

WHEREFORE, Bleid Sports respectfully requests as follows:

A. Judgment in its favor on Counts I to VI of this Complaint;

B. Actual damages in an amount sufficient to compensate Bleid for the damages it has suffered as the result of the NCAA's actions, in an amount to be proven at trial;

C. Punitive damages in an amount to be proven at trial;

D. Treble damages, as set forth in 15 U.S.C. § 15(a);

E. Reasonable attorneys' fees and costs expended herein;

F. Trial by jury, on all issues so triable;

G.     Any and all other legal or equitable relief to which it may be entitled.

                                        Respectfully submitted,

                                        /s/Allison Brown Vermilion_____
                                        Gregory S. Berman
                                        Allison Brown Vermilion
                                        WYATT, TARRANT & COMBS, LLP
                                        500 West Jefferson Street
                                        Suite 2800
                                        Louisville, KY  40202-2898
                                        502.589.5235
                                        ***Counsel for Plaintiff***

60271147.1